**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

Eastern District of Kentucky
**F I L E D**

MAR - 1 2018

AT LEXINGTON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

**UNITED STATES OF AMERICA**

V.                                          **INDICTMENT NO.** $5\cdot18$ cr $32$ JMH

**RONNIE JOLLY**

\* \* \* \* \*

**THE GRAND JURY CHARGES:**

## INTRODUCTION

1.      RONNIE JOLLY, defendant herein, and others worked together to defraud
the United States through the filing of false insurance claims ultimately reimbursed by
the United States Department of Agriculture ("USDA"), by making false statements and
reports in connection with the federal crop insurance program.

### STATUTORY AND REGULATORY BACKGROUND

2.      In 1938, Congress passed the Federal Crop Insurance Act ("Act"), 7 U.S.C.
§ 1501 *et seq.*, in order to promote the economic stability of agriculture in the United
States through, in part, a system of crop insurance.

3.      In furtherance of this purpose, Congress established the Federal Crop
Insurance Corporation ("FCIC"), which was authorized to insure crop losses due to
drought, flood, or other natural disaster, as determined by the Secretary of the USDA. 7
U.S.C. § 1503, 1508. Tobacco, wheat, corn, and soybeans were among the crops for

which insurance was authorized under the Act. 7 U.S.C. § 1518.

4.     The Act only authorized the extension of insurance coverage to producers, that is, a person or entity with a bona fide insurable interest in a crop as either an owner-operator, landlord, tenant, or sharecropper. 7 U.S.C. § 1520. Farmers are producers. A crop insurance policy under the Act provided payments to a farmer when bad weather (freeze, drought, etc.) or other such naturally occurring events caused the harvest for the farm to be less than the amount specified in the insurance contract or written policy agreement, also known as the "guarantee." These federally-backed crop insurance policies are referred to as multi-peril crop insurance ("MPCI") policies.

5.     Farmers who opt to insure their crop are required to take out insurance policies prior to the growing season. Farmers generally do not pay their policy premiums until the growing season has ended and when the farmer knows whether or not his or her yield (i.e., the amount of crop harvested from a specific farm) justified an insurance claim. If the farmer makes a claim under his or her crop insurance policy, then the insurance premium is typically deducted from the amount paid out to the farmer under the policy.

6.     Under the crop insurance program, eligible farmers are paid benefits based, in part, on factual representations as to the amount of crop harvested and sold and the cause of loss.

7.     The insurance coverage, also called the guarantee, and premiums of coverage are based on four or more years of production records for a particular crop grown by a farmer on a specific farm designated by its unique Farm Serial Number

("FSN"). This means that the farmer's actual production history ("APH") determines the insurance policy's guarantee, based on how much of that crop the farmer has produced on that FSN during each of the four years immediately preceding the year for which insurance is sought. 7 U.S.C. § 1508. If a farmer has produced that crop for more than four years, the guarantee will be based upon that farmer's production history of those preceding years, but no more than ten years of production history will be used. 7 U.S.C. § 1508. A new producer is a person who has not actively engaged in farming of the crop sought to be insured in the county for more than two years. 7 C.F.R. § 400.52. New producers are given an estimated production yield based upon the county average production for the crop for the past 4 years. See 7 C.F.R. §§ 400.52(m), 400.52(p) and 400.55(b)(6).

8.      A farmer can elect to insure tobacco crop up to 75% of the APH guarantee. If a farmer elects 75% coverage on his tobacco crop, that farmer needs to sustain crop damage in excess of 25% to trigger a claim payment. A farmer can elect to insure corn and soybean crops up to 85% of the APH guarantee and may elect revenue protection.

9.      The Risk Management Agency ("RMA") is an agency of the USDA that supervises the FCIC and administers all programs authorized under the Act. 7 U.S.C. § 6933. Most crop insurance is sold by approved private insurance companies, called Approved Insurance Providers ("AIPs"), through an insurance agent working on behalf of the AIP. AIPs are reinsured by the FCIC/RMA under provisions established in a Standard Reinsurance Agreement ("SRA"), a contract between the AIPs and RMA. The FCIC/RMA also pays, or subsidizes, a portion of the premium paid by the farmer.

10.    The insurance agent obtains basic information from the producer pertaining to the crop to be insured. This information is reported on forms the producer sends to his or her agent. The producer and agent acknowledge on these forms that failure to report completely and accurately may void the applicant's crop insurance policy and may result in criminal or civil false claims actions. The crop insurance agent forwards this information through the insurance company to FCIC/RMA. This information, including the Production Worksheet, is used to calculate the premium to be paid by the producer for the insurance, and is also used to calculate the indemnity in the event of a loss claim.

11.    Producers often elect to take their crop to harvest even after the crop has sustained damage.  A Production Worksheet is used to record the amount of harvested production to include crop sales, quality assessments, and harvest appraisals, among other things, to ascertain the production to count, or actual yield, used in determining the indemnity due. The producer certifies on this report that failure to report completely and accurately may result in the voiding of the applicant's crop insurance contract and may result in criminal or civil false claims actions.

12.    The FCIC tobacco crop provisions provide for quality loss adjustment should the burley tobacco crop sustain damage reducing the quality of the crop.  RMA's procedures for burley tobacco rely on grades assigned by Agriculture Marketing Service ("AMS") graders using USDA Official Standard Grades. The lowest grade quality is a No Grade ("NOG"). A loss that reduces the quality, or grade, of the tobacco can result in an increased indemnity.

13.    According to RMA established procedures, if the producer believes he or

she has a potential loss of quality, he or she must determine which bales of tobacco need to be graded. The Tobacco Administration Grading Service ("TAGS") was established to facilitate the grading process and provide scheduling services via telephone or a website. A producer with a potential loss of quality can schedule an inspection with the AMS grader by contacting TAGS. The producer may ask his or her crop insurance agent for assistance in scheduling an inspection. The producer is charged a fee for the grading process. The producer receives a unique Grading Confirmation Number ("GCN") intended to track the bales graded. AMS electronically transmits the GCN information to RMA. Tobacco bales designated as NOG receive the highest discount factor resulting in a higher amount of loss, and thus, higher indemnities. The grade, weights, and other relevant information is transmitted to the appropriate insurance company to complete the claim.

14.    When a loss is paid on a crop insurance policy, the loss is calculated by the AIP and paid to the producer, often through the agent. Pursuant to the SRA, the AIP is reimbursed by the FCIC/RMA.

15.    Insured producers are required to retain documentation related to their crop from planting through the disposition of their crop, including receipts for seed and other expenditures. They may be required to turn this documentation over to their agent or AIP to justify claims of loss or other inquiries.

16.    In addition to federal insurance coverage, a farmer may also elect to obtain private insurance coverage. The private market offers insurance coverage directly to the producer to cover specific perils, such as hail, wind, and fire. State insurance departments

regulate private crop insurance; FCIC does not reinsure or regulate private insurance.

17.     Private crop hail policies provide additional coverage and protection for the erratic damage hail can cause to a crop. The advantages of a private crop hail policy are the availability to purchase from several private insurers for a variety of crops, claims are often paid following the damage assessment (i.e., even paid before harvest), and insurance may be purchased at any time during the growing season. Private crop hail insurance providers establish limits to the amount of dollar coverage for crops and premium rates.

18.     Private crop hail insurance is popular in areas prone to hail events during the growing season. The producer may use private hail crop insurance as a tool to reduce the risk between the value of their crop and coverage available with the MPCI policy. The difference between the actual production and the coverage level is often referred to as the "gap" in coverage or a deductible. For example, if tobacco is insured at 75% (the maximum allowed by the MPCI policy) of the production guarantee, the gap coverage is 25%. The producer may use private hail crop insurance as a tool to reduce the risk between the value of their crop and coverage available with the FCIC.

19.     AIPs often offer combination policies to their customers, whereby producers can obtain a combination MPCI and private insurance coverage for their crop. In this scenario, the federal government continues to reinsure the MPCI indemnities, while the private company backs the private policy.

### FACTUAL BACKGROUND

20.     At all times relevant hereto, RONNIE JOLLY owned and rented farmland in Bath, Bourbon, Fleming, Montgomery, and Scott Counties, all located within the

Eastern District of Kentucky. RONNIE JOLLY produced, among other crops, tobacco,

corn, and soybeans, which he began to insure through federal crop insurance in or around

2008.

21.    K.T., D.M., and K.O. all worked for RONNIE JOLLY on his farms. C.G. is

JOLLY's stepson. JOLLY handled C.G.'s crop insurance matters and shared his farm

equipment with C.G.

**COUNT 1**
**18 U.S.C. § 371**

22.    From in or about late 2010 through in or about early 2016, in Bath,

Bourbon, Fleming, Montgomery, and Scott Counties, all located within the Eastern

District of Kentucky, and elsewhere,

**RONNIE JOLLY**

and others knowingly and willfully conspired and agreed together and with each other, to

commit an offense against the United States, that is, making false statements and reports

for the purpose of influencing in any way the actions of the FCIC, and companies the

FCIC reinsures, upon an application, advance, commitment, loan, and insurance

agreement or application for insurance or a guarantee, in violation of 18 U.S.C. § 1014.

**PURPOSE OF THE CONSPIRACY**

23.    It was the purpose of the conspiracy to profit through the filing of false and

fictitious crop insurance claims and the sale of unreported tobacco, corn, and soybeans.

**MANNER AND MEANS**

24.    In furtherance of the conspiracy, RONNIE JOLLY, along with others

known and unknown, employed the following manner and means:

a. <u>Hiding Crop Sales.</u>  RONNIE JOLLY produced more crop than he reported to his AIP.  He hid this excess production by selling it in other people's names or otherwise failed to report crop sales to his AIP, as a way to conceal the amount of crop he produced.  In this way, JOLLY could claim to have harvested less crop than his guaranteed yield on his insurance policy, which, after claiming damage to his crop, would trigger an indemnity payout on the insurance policy.

   i. For crop year 2010, RONNIE JOLLY produced approximately 20,727 pounds of tobacco that he did not report to his AIP. He hid this tobacco by selling it at Clay's Tobacco Warehouse in his minor daughter's name.  JOLLY's minor daughter did not raise tobacco.  Because of this misrepresentation, JOLLY was able to make MPCI claims of loss on his tobacco crop in 2010, and received $206,820 in crop insurance indemnity payments.

   ii. For crop year 2010, RONNIE JOLLY produced approximately 863 bushels of soybeans that he did not report to his AIP.  In 2011, he hid his soybeans by selling the soybean production in his minor son's name.  His minor son did not produce these soybeans.  Because of this misrepresentation, JOLLY was able to make MPCI claims of loss on his soybean crop in 2010, and received $107,278 in crop insurance indemnity payments.

iii.  For crop year 2011, records show that RONNIE JOLLY produced
approximately 10,927.68 bushels of soybeans.  JOLLY reported only
5,534 bushels of soybeans to his AIP, hiding 5,393.68 bushels of
soybeans from his AIP. Because of this misrepresentation, JOLLY
was able to make an MPCI claim of loss on his soybean crop
produced in 2011, and received $92,796 in insurance indemnity
payments.

iv.  For crop year 2012, records show that RONNIE JOLLY produced
approximately 41,767 bushels of corn.  JOLLY reported the
production of only 11,833.21 bushels of corn to his AIP.  He hid the
remaining corn bushels by selling the corn in the name of H.J. and
his minor son.  H.J. and his minor son did not produce this corn.
Because of this misrepresentation, JOLLY was able to make an
MPCI claim of loss on his corn crop grown in 2012, and received
$347,191 in insurance indemnity payments.

v.  For crop year 2012, records show that RONNIE JOLLY produced
approximately 9,378.16 bushels of soybeans.  JOLLY reported the
production of only 6,310.66 bushels of soybeans to his AIP.  Had
JOLLY honestly reported his entire production, he would have
exceeded his insurance indemnity guarantee, resulting in no
indemnity payout.  Instead, as a result of his failure to accurately
report his production, JOLLY was able to make an MPCI claim of

loss on his soybean crop in 2012, and received an insurance indemnity payment of $27,554.

vi. For crop year 2013, RONNIE JOLLY sold approximately 81,529.54 bushels of corn, but only reported to his AIP that he produced 20,628.8 bushels of corn. JOLLY sold some of this unreported corn crop under his minor son's name, and simply failed to report the remaining production to his AIP. Had JOLLY reported his entire production, he would have produced more than his insurance guaranteed yield, preventing him from collecting an indemnity payment. As a result of hiding his production, JOLLY made two MPCI claims of loss on his 2013 corn production, resulting in $242,962 in MPCI payments.

vii. For crop year 2014, RONNIE JOLLY reported to his AIP that he produced 26,082 pounds of tobacco. Sales records show that he actually sold approximately 59,580 pounds of tobacco, which he hid by selling in his two minor sons' names. His two minor sons did not produce this tobacco. He also sold nearly 8,000 pounds of tobacco in fake names, Fred House and Jon Brown. As a result of hiding his production, JOLLY made two MPCI claims of loss on his 2014 tobacco production, resulting in $183,624 in MPCI payments.

viii. For crop year 2015, RONNIE JOLLY reported that he produced only 20,007 pounds of tobacco to his AIP. However, on November

18 and 25, 2015, JOLLY delivered approximately 62,091 additional pounds of tobacco to Clay's Tobacco Warehouse under the names of his two minor children. Moreover, JOLLY sold additional tobacco worth approximately $26,000 directly to other farmers, requesting that payment be made out to H.J. JOLLY did not report the tobacco he sold under the names of his two minor sons or H.J. Because of these misrepresentations, JOLLY was able to file a MPCI claim of loss on his 2015 tobacco production, intending to receive an indemnity payment of $122,296 for his crop year 2015 tobacco.

b. <u>Placing Crop Insurance Policies in Nominee Names</u>. By falsely obtaining a crop insurance policy in a new producer's name, the actual producer is able to use the county average yield as his APH, which would determine the guaranteed yield on crop insurance. In addition, obtaining crop insurance policies in another producer's name can help the actual producer avoid RMA scrutiny of his insurance policies. RMA conducts a high dollar indemnity review, for those indemnity payments exceeding $200,000, and indemnity payments that exceed $500,000 are referred to RMA for possible participation in claim activities. By spreading out his claimed losses out amongst different nominee producer names, RONNIE JOLLY was able to avoid additional RMA oversight.

i. For crop year 2014, RONNIE JOLLY obtained a crop insurance policy in the name of K.T. K.T. sold approximately 8,663 pounds of

tobacco from crop year 2014. JOLLY filed an insurance claim on K.T.'s insured crop and received $83,851 in an indemnity payment.

ii. For crop year 2015, JOLLY obtained crop insurance in the names of K.T., K.O., and D.M. JOLLY filed crop insurance losses on each of these policies. The indemnity payments for K.O., $105,271, and D.M., $100,272, were deposited directly into JOLLY's account. The indemnity payment for K.T. amounted to $95,103, which was deposited into K.T.'s account. K.T. wrote JOLLY a check worth 80% of the crop insurance payment, which JOLLY deposited into his own account.

c. Submitting False Grade and Sales Reports.

   i. RONNIE JOLLY hid the production of his good quality tobacco by only reporting production of poor quality tobacco, which would receive a poor quality grade and result in a higher claim of loss to the AIP. To effectuate this scheme, JOLLY would sell his good quality tobacco for cash at Clay's Tobacco Warehouse under names like House, Green, and Brown, believed to be fictitious names. JOLLY then either presented poor quality tobacco that he produced, or presented poor quality tobacco that did not belong to him, to a tobacco grader in order to receive a grade report stating JOLLY's tobacco was poor quality. Individuals at Clay's Tobacco Warehouse would then generate false sales bills that purported to show JOLLY

selling this poor quality tobacco at Clay's Tobacco Warehouse. The payment for these purported sales would be listed as, "applied to advances." In this way, JOLLY received fake sales reports and grade sheets to submit to his AIP, but Clay's Tobacco Warehouse did not have to actually write a check.

## OVERT ACTS

25.    On January 12, 2011, RONNIE JOLLY certified the pounds of tobacco he produced in crop year 2010 on three Production Worksheets. He submitted these documents, directly or through his insurance agent, to his AIP as his total tobacco production for crop year 2010, knowing that he produced more tobacco than he reported.

26.    On January 4, 2011, RONNIE JOLLY certified the bushels of soybeans he produced in crop year 2010 on numerous Production Worksheets. He submitted these documents, directly or through his insurance agent, to his AIP as his total soybean production for crop year 2010, knowing that he produced more soybeans than he reported.

27.    On January 19, 2012, RONNIE JOLLY certified the bushels of soybeans he produced in crop year 2011 on numerous Production Worksheets. He submitted these documents, directly or through his insurance agent, to his AIP as his total soybean production for crop year 2011, knowing that he produced more soybeans than he reported.

28.    On January 9, 2013, RONNIE JOLLY certified the bushels of corn he produced in crop year 2012 on numerous Production Worksheets. He submitted these

documents, directly or through his insurance agent, to his AIP as his total corn production for crop year 2012, knowing that he produced more corn than he reported.

29.     On February 4, 2014, RONNIE JOLLY certified the bushels of corn he produced in crop year 2013 on two Production Worksheets.  He submitted these documents, directly or through his insurance agent, to his AIP as his total corn production for crop year 2013, knowing that he produced more corn than he reported.

30.     On March 3, 2015, RONNIE JOLLY certified the pounds of tobacco he produced in crop year 2014 on three Production Worksheets. He certified to a corrected Production Worksheet for one of the farms in crop year 2014, on April 15, 2015.  He submitted these documents, directly or through his insurance agent, to his AIP as his total tobacco production for crop year 2014, knowing that he produced more tobacco than he reported.

31.     On January 18, 2016, RONNIE JOLLY certified the pounds of tobacco he produced in crop year 2015 on a single Production Worksheet.  He submitted this document, directly or through his insurance agent, to his AIP as his total tobacco production for crop year 2014, knowing that he produced more tobacco than he reported.

32.     On or around February 26, 2014, RONNIE JOLLY applied or caused application documents to be submitted for a MPCI insurance coverage for 100 acres of burley tobacco and 500 acres of soybeans in K.T.'s name.  On or around June 21, 2014, JOLLY submitted or caused to be submitted additional documentation causing K.T. to apply for and obtain a combination private and MPCI policy covering burley tobacco in Bourbon, Bath, and Montgomery Counties.

33.     On or around February 25, 2014, RONNIE JOLLY applied or caused application documents to be submitted for a combination private and MPCI policy covering 100 acres of burley tobacco and 500 acres of soybeans in K.O.'s name.

34.     On or around February 23, 2015, RONNIE JOLLY applied or caused application documents to be submitted for a MPCI policy covering 60 acres of burley tobacco and 200 acres of soybeans in Bourbon County and 60 acres of burley tobacco and 200 acres of soybeans in Bath County, in D.M.'s name.

All in violation of 18 U.S.C. § 371.

## COUNTS 2 THROUGH 7
### 18 U.S.C. § 1014
### 18 U.S.C. § 2

35.     Paragraphs 1 through 34 (Count One) above are re-alleged and incorporated herein by reference.

36.     On or about the dates listed below, in Bath, Bourbon, Fleming, Montgomery, and Scott Counties, all located within the Eastern District of Kentucky, and elsewhere,

### RONNIE JOLLY

aided and abetted by others, knowingly made false statements and reports for the purpose of influencing in any way the action of the FCIC, and companies the FCIC reinsures, upon an application, advance, commitment, loan, and insurance agreement or application for insurance or a guarantee, to wit:

| Count | Date | False Statement |
|-------|------|-----------------|
| 2 | February 4, 2014 | False Production Worksheets certifying a lower amount of corn production than was actually produced. |

| 3 | March 3, 2015 and April 15, 2015 | False Production Worksheets certifying a lower amount of tobacco production than was actually produced. |
| 4 | January 18, 2016 | False Production Worksheets certifying a lower amount of tobacco production than was actually produced. |
| 5 | February 25, 2014 | False application for MPCI policy in the name of K.O. |
| 6 | February 26, 2014 | False application for MPCI policy in the name of K.T. |
| 7 | February 23, 2015 | False application for MPCI policy in the name of D.M. |

All in violation of Title 18, United States Code, Section 1014.

### COUNT 8
### 18 U.S.C. § 1349

37.     From in or about mid-2014, through in or about early 2016, in Bath, Bourbon, Fleming, Montgomery, and Scott Counties, all located within the Eastern District of Kentucky, and elsewhere,

### RONNIE JOLLY

and others knowingly and intentionally conspired with each other to commit mail and wire fraud, in violation of 18 U.S.C. § 1341 and 1343.

### PURPOSE OF THE CONSPIRACY

38.     It was the purpose of the conspiracy to profit through the filing of false and fictitious insurance claims.

### MANNER AND MEANS

39.     Paragraphs 1 through 36 are re-alleged and incorporated as if fully set forth herein.

40.     In 2014, it was part of the conspiracy that JOLLY, in conjunction with his insurance agent M.M., caused private crop insurance policies to be issued in the name of his employees K.T. and K.O., and his stepson, C.G., without their knowledge or consent,

claiming that K.T., K.O., and C.G. had a 100% insurable interest in crop for which JOLLY owned or rented the land and paid the inputs. The private crop insurance company was induced to insure the crop in the names of C.G., K.T., and K.O. not knowing that these policies were actually for JOLLY's benefit. JOLLY caused the application documents to be submitted through his insurance agent, M.M., via mail or electronic wires. JOLLY, with the assistance of M.M. and crop insurance adjusters, also caused false documentation to support a damage claim to the crop in the names of K.T. and C.G. to be generated and submitted to the insurance company through the mail or interstate wire communication.

41.     In 2015, JOLLY, in conjunction with M.M., caused private crop insurance policies to be issued in the name of JOLLY's stepson, C.G., and employees D.M., K.T., and K.O., all of whom were unaware of JOLLY's actions. These private insurance applications claimed that K.T. and C.G. had a 100% insurable interest in crop for which JOLLY owned or rented the land and paid the inputs. The private crop insurance company was induced to insure the crop in the names of C.G., K.T., D.M., and K.O. JOLLY caused the application documents to be submitted through his insurance agent, M.M., via mail or electronic, interstate wires. JOLLY, with the assistance of M.M. and crop insurance adjusters, also caused false documentation to support a damage claim to the crop to be generated and submitted to the insurance company through the mail or interstate wire communication.

42.     It was further part of the scheme that JOLLY and M.M. caused the insurance company, ARMtech, to issue insurance indemnity payments to C.G., K.T.,

D.M., and K.O., which were either sent in the form of a check through the mail or deposited electronically into a bank account using interstate wire communication.

All in violation of 18 U.S.C. § 1349.

### COUNTS 9 TO 30
**18 U.S.C. § 1957**
**18 U.S.C. § 2**

43.     On or about the dates set forth below, in Montgomery and Fleming Counties, in the Eastern District of Kentucky, and elsewhere,

**RONNIE JOLLY**

did knowingly engage in the following monetary transactions by, through, or to a financial institution affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, that is the withdrawal of funds, such property having been derived from a specified unlawful activity, that is, conspiracy to commit an offense in violation of 18 U.S.C. § 371, crop insurance fraud in violation of 18 U.S.C. § 1014, and conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349:

| Count | Date | Amount | Monetary Transaction |
|---|---|---|---|
| 9 | December 4, 2013 | $35,000.00 | Check No. 1469 to Daniel Cameron |
| 10 | January 28, 2014 | $14,506.51 | Check No. 1419 to Citicard |
| 11 | February 19, 2014 | $27,827.09 | Check No. 1533 to Community Trust Bank |
| 12 | February 24, 2014 | $152,068.57 | Check No. 1540 to John Deere Financial |
| 13 | February 26, 2014 | $23,119.00 | Check No. 1541 to Farm Credit Mid-America |
| 14 | December 22, 2014 | $100,000.00 | Check No. 1869 to Farm Credit Mid-America |
| 15 | December 26, 2014 | $23,500.00 | Check No. 1875 to Chris Gates |
| 16 | December 30, 2014 | $42,566.32 | Check No. 1861 to Kay Warren |
| 17 | December 31, 2014 | $125,000.00 | Check No. 1880 to Farm Credit Mid-America |
| 18 | January 13, 2015 | $11,919.25 | Check No. 1890 to Bourbon County Master Commissioner |
| 19 | January 16, 2015 | $50,000.00 | Check No. 1896 to Farm Credit Mid-America |
| 20 | February 12, 2015 | $35,800.00 | Check No. 1923 to Chris Gates |

| 21 | February 13, 2015 | $133,265.35 | Check No. 1924 to Farm Credit Mid-America |
| 22 | March 11, 2015 | $82,598.00 | Check No. 1946 to Chris Gates |
| 23 | March 16, 2015 | $207,995.81 | Check No. 1948 to Community Trust Bank |
| 24 | October 1, 2015 | $15,202.11 | Check No. 9246 to Citicard |
| 25 | October 2, 2015 | $75,500.73 | Check No. 2161 to United Producers |
| 26 | October 16, 2015 | $13,950.00 | Check No. 2173 to United Producers |
| 27 | November 16, 2015 | $13,250.00 | Check No. 2193 to Grady Rogers |
| 28 | November 17, 2015 | $13,250.00 | Check No. 2192 to Shane Brock |
| 29 | November 24, 2015 | $99,809.06 | Debit to Dupont Pioneer |
| 30 | November 27, 2015 | $13,275.00 | Check No. 2205 to John Renkin |

All in violation of 18 U.S.C. §§ 2 and 1957.

## COUNT 31
### 31 U.S.C. § 5324(a)(3)

44.     On or about the dates set forth below, in Montgomery and Fleming

Counties, in the Eastern District of Kentucky,

**RONNIE JOLLY**

did knowingly and for the purpose of evading reporting requirements of 31 U.S.C.

§ 5313(a), and the regulations promulgated thereunder, structure the following transactions

with domestic financial institutions, and did so while violating another law of the United

States:

| Date | Amount | Monetary Transaction |
|------|--------|----------------------|
| September 14, 2015 | $9,500.00 | Cashed check No. 2143 |
| September 15, 2015 | $9,500.00 | Cashed check No. 2144 |
| September 16, 2015 | $9,500.00 | Cashed check No. 2149 |
| September 17, 2015 | $9,500.00 | Cashed check No. 2150 |

All in violation of 31 U.S.C. §§ 5324(a)(3) and 5324(d); 31 C.F.R. 1010.100(t),

1010.311, and 1010.313; and 18 U.S.C. § 2.

**FORFEITURE ALLEGATION**
**18 U.S.C. § 982**
**18 U.S.C. § 981(a)(l)(C)**
**28 U.S.C. § 2461(c)**
**31 U.S.C. § 5317**

In committing the felony offenses alleged in Counts 1 through 7 of this Indictment, each punishable by imprisonment for more than one year, RONNIE JOLLY shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2)(A), any property constituting, or derived from, proceeds obtained directly or indirectly, as the result of violations of 18 U.S.C. § 1014.

In committing the felony offense alleged in Count 8 of this Indictment, punishable by imprisonment for more than one year, RONNIE JOLLY shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(l)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of mail fraud and wire fraud.

In committing the felony offenses alleged in Counts 9-30 of this Indictment, punishable by imprisonment for more than one year, RONNIE JOLLY shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1) any property, real or personal, involved in such offense or any property traceable to such property.

In committing the felony offense alleged in Count 31 of this Indictment, punishable by imprisonment for more than one year, RONNIE JOLLY shall forfeit to the United States, pursuant to 31 U.S.C. § 5317 all property, real or personal, involved in the

offense and any property traceable to such property.

The property to be forfeited includes, but is not limited to, the following:

**REAL PROPERTY**

1.  244.251 acres located at 1131 College Road, Paris, Kentucky, parcel

    number 060-00-00-025.00

2.  131.91 acres located at Jackstown Road, Bourbon County, Paris,

    Kentucky, parcel number 065-00-00-012.00

**CASH/CURRENCY**:

All funds on deposit in the account of Ronnie W. Jolly, Community Trust

Bank, account number xxxx9442.

**MONEY JUDGMENT**:

$2,626,046.00, representing the approximate amount of proceeds derived

from making false statements on bank loan applications, mail fraud, and

wire fraud, and property involved in or traceable to money laundering, and

structuring.

SUBSTITUTE ASSETS:

If any of the property listed above, as a result of any act or omission of the

defendant,

(1) cannot be located upon the exercise of due diligence
(2) has been transferred or sold to, or deposited with, a third party;
(3) has been placed beyond the jurisdiction of the Court;
(4) has been substantially diminished in value; or
(5) has been commingled with other property which cannot be divided without
difficulty;

it is the intent of the United States to seek the forfeiture of any other property in which

the above defendant has an interest, up to the value of the judgment described above and

pursuant to 21 U.S.C. § 853(p), as incorporated in 18 U.S.C. § 982(b)(1).


**A TRUE BILL**




**ROBERT M. DUNCAN, JR.**
**UNITED STATES ATTORNEY**

## **PENALTIES**

**COUNT 1:**        Not more than 5 years imprisonment, $250,000 fine or twice the gross gain or loss, and 3 years supervised release.

**COUNTS 2-7:**     Not more than than 30 years imprisonment, $1,000,000 fine or twice the gross gain or loss, and 5 years supervised release.

**COUNT 8:**        Not more than 20 years imprisonment, $250,000 fine or twice the gross gain or loss, and 3 years supervised release.

**COUNTS 9-30:**    Not more than 10 years imprisonment, $250,000 fine or twice the gross gain or loss, and 3 years supervised release.

**COUNT 31:**       Not more than 20 years imprisonment, $250,000 fine or twice the gross gain or loss, and 3 years supervised release.

**PLUS:**           Mandatory special assessment of $100 per count.

**PLUS:**           Restitution, if applicable.