Eastern District of Kentucky
FILED
NOV 19 2018
AT LEXINGTON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

CRIMINAL ACTION NO. 18-32-JMH

UNITED STATES OF AMERICA                                                    PLAINTIFF

V.                            **PLEA AGREEMENT**

RONNIE JOLLY                                                                 DEFENDANT

\* \* \* \* \*

1. Pursuant to Federal Rule of Criminal Procedure 11(c), the Defendant will enter a guilty plea to Counts 1, 4, 8, and 12 of the Indictment, charging a violation of 18 U.S.C. § 371, Conspiracy to Commit an Offense against the United States, 18 U.S.C. § 1014, Crop Insurance Fraud, 18 U.S.C. § 1349, Conspiracy to Commit Mail or Wire Fraud, and 18 U.S.C. § 1957, Money Laundering. Pursuant to Rule 11(c)(1)(A), the United States will move at sentencing to dismiss Counts 2, 3, 5, 6, 7, 9 through 11, and 13 through 31.

2. The essential elements of Count 1 are:

    (a) That two or more persons conspired, or agreed, to defraud the United States, by committing the crime of making false statements and reports for the purpose of influencing in any way the actions of the FCIC, and companies the FCIC reinsures, upon an application, advance, commitment, loan, and insurance agreement or application for insurance or a guarantee, in violation of 18 U.S.C. § 1014;

    (b) That the Defendant knowingly and voluntarily joined the conspiracy; and

(c) That the Defendant joined the conspiracy knowing of its objective to defraud the United States and intending to join together with at least one other conspirator to achieve that objective; and

(d) That at some point during the existence of the conspiracy, at least one of its members performed an overt act in order to further the objective of the conspiracy.

The essential elements of Count 4 are:

- (a) That the Defendant made or caused to be made a false statement or report to the Federal Crop Insurance Corporation upon an application, commitment, loan, and insurance agreement or application for insurance or a guarantee;

- (b) That the Defendant acted knowingly; and

- (c) That the Defendant made or caused to made the false statement or report for the purpose of influencing in any way the action of the Federal Crop Insurance Corporation.

The essential elements of Count 8 are:

- (a) That two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit mail and wire fraud, as charged in the Indictment; and

- (b) That the Defendant knew the unlawful purpose of the plan and willfully Joined in it.

The essential elements of Count 12 are:

- (a) The Defendant knowingly engaged in a monetary transaction;

- (b) The monetary transaction involved criminally derived property;

- (c) The criminally derived property had a value greater than $10,000;

- (d) The Defendant knew that the transaction was in criminally derived property; and

- (e) The monetary transaction took place within the United States.

3. As to Counts 1, 4, 8, and 12, the United States could prove the following facts that establish the essential elements of the offense beyond a reasonable doubt, and the Defendant admits these facts:

(a) The Defendant owned and rented farmland in Bath, Bourbon, Fleming, Montgomery, and Scott Counties, all located within the Eastern District of Kentucky. The Defendant produced, among other crops, tobacco, corn, and soybeans, which he began to insure through federal crop insurance in or around 2008.

(b) D.M. and K.O. worked for the Defendant on his farms.

(c) From in or about late 2010 through in or about early 2016, the Defendant made material misrepresentations on his federal crop insurance policy paperwork, for the purpose of receiving money from the federal government to which he was not entitled. From in or about mid-2014, through in or about early 2016, the Defendant made material misrepresentations to private crop insurance companies for the purpose of receiving money from those entities to which he was not entitled. He did this in the following ways:

    1. *Federal.* The Defendant produced more crop than he reported to his Approved Insurance Provider (AIP). He hid this excess production by selling it in other people's names or otherwise failed to report crop sales to his AIP. In this way, the Defendant could claim to have harvested less crop than his guaranteed yield on his insurance policy, which, after claiming damage to his crop, would trigger an indemnity payout and/or cause a larger payout on the insurance policy.

        i. For example, on January 18, 2016, the Defendant certified that he produced only 20,007 pounds of tobacco in crop year 2015 on a single Production Worksheet. He submitted this document to his

AIP as part of his claim for an insurance payment. However, on November 18 and 25, 2015, the Defendant delivered approximately 62,091 additional pounds of tobacco to Clay's Tobacco Warehouse under the names of his two minor children that he did not report to his AIP. The Defendant sold additional tobacco worth approximately $26,000 directly to other farmers, requesting that payment be made out to H.J., which he did not report to his AIP. Because of these misrepresentations, the Defendant was able to file a MPCI claim of loss on his 2015 tobacco production, intending to receive an indemnity payment of $122,296 for his crop year 2015 tobacco.

2. *Federal.* The Defendant sold his good quality tobacco for cash at Clay's Tobacco Warehouse. Sales tickets show this tobacco sold under fictitious names like House, Green, and Brown. Poor quality tobacco was presented to USDA graders as belonging to the Defendant that did not in fact belong to him, in order to receive a grade report stating the Defendant's tobacco was poor quality. Coconspirators at Clay's Tobacco Warehouse would then generate false sales bills that purported to show the Defendant selling this poor quality tobacco at Clay's Tobacco Warehouse. In this way, the Defendant was able to sell good quality tobacco to Clay's Tobacco Warehouse for cash, and then receive the paperwork necessary to file a false insurance claim for his tobacco production that could be quality adjusted due to false poor quality grades.

3. *Federal.* The Defendant obtained federal crop insurance policies in other people's names, such as D.M. and K.O., and D.M. and K.O. signed the necessary documentation to obtain these insurance policies. The Defendant deposited the indemnity checks that were proceeds of the claims on these policies into his own account. The Defendant paid D.M. and K.O. a portion

of the proceeds, but retained around 70-80% of the indemnity payout.

   i. For example, for crop year 2015, the Defendant agreed with K.O. and D.M to cause AIPs to issue federal crop insurance policies in the name of K.O. and D.M. The Defendant filed crop insurance losses on these policies. The indemnity payments for K.O., $105,271, and D.M., $100,272, were deposited directly into the Defendant's account, less the premium removed by the insurance agency.

4. *Private*. The Defendant also obtained private crop insurance policies in other people's names. For private policies, the Defendant acted with the assistance of his insurance agent, M.M., and his crop insurance adjusters.

   i. In 2015, the Defendant, working with M.M., caused private crop insurance policies to be issued in the names of D.M. and K.O. The Defendant caused the application documents to be submitted through his insurance agent, M.M., via mail or interstate wires. Then, the Defendant, working with M.M. and crop insurance adjusters, caused false documentation to support a damage claim to the crop to be generated and submitted to the insurance company through the mail or interstate wire communication.

(d) With proceeds from the conduct described in Paragraphs 3(a) through (c), the Defendant made numerous payments for his personal benefit and the benefit of his farming operation in amounts that exceeded $10,000, while in the Eastern District of Kentucky.

   a. For example, on February 19, 2014, ARMtech Insurance Services issued the Defendant three checks, for $130,859.00, $96,269.00, and $71,698.96, respectively, based on insurance paperwork containing material misrepresentations. He deposited this money into his Community Trust Bank Account *442. Then, on February 24, 2014, the Defendant wrote a check out of Account *442, to John Deere Financial Company for

5

$152,068.57.

4. The statutory punishment for Count 1 is imprisonment for not more than 5 years, a fine of not more than $250,000 or twice the gross gain or loss, and a term of supervised release of not more than 3 years. The statutory punishment for Count 4 is imprisonment for not more than 30 years, a fine of not more than $1,000,000 or twice the gross gain or loss, and a term of supervised release of not more than 5 years. The statutory punishment for Count 8 is imprisonment for not more than 20 years, a fine of not more than $250,000 or twice the gross gain or loss, and a term of supervised release or not more than 3 years. The statutory punishment for Count 12 is imprisonment for not more than 10 years, a fine of not more than $250,000 or twice the value of the monetary instruments or funds involved, and a term of supervised release of not more than 3 years. A mandatory special assessment of $400 applies, and the Defendant will pay this assessment to the U.S. District Court Clerk at the time of the entry of the plea.

5. Pursuant to Rule 11(c)(1)(B), the United States and the Defendant recommend the following sentencing guidelines calculations, and they may object to or argue in favor of other calculations. This recommendation does not bind the Court.

(a) United States Sentencing Guidelines (U.S.S.G.), November 1, 2016, manual, will determine the Defendant's guidelines range.

(b) Pursuant to U.S.S.G. § 3D1.1, the multiple counts of conviction should be grouped together, and the offense level shall be calculated under U.S.S.G. § 2S1.1.

(c) Pursuant to U.S.S.G. § 2S1.1(a)(1), the base offense level is the offense level for the underlying offense from which the laundered funds were derived. The calculation for the underlying offense is as follows:

6

      a. Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is 7.

      b. Pursuant to U.S.S.G. § 2B1.1(b)(1)(I), increase the offense level by 16 levels because the offense involved a loss of more than $1,500,000 and less than $3,500,000.

      c. Pursuant to U.S.S.G. § 2B1.1(b)(10)(c), increase the offense level by 2 levels because the offense involved sophisticated means and the Defendant intentionally engaged in or caused the conduct constituting sophisticated means. The Defendant does not agree to this enhancement.

(d) Pursuant to U.S.S.G. § 2S1.1(b)(2)(A), increase by 1 level because the Defendant was convicted under 18 U.S.C. § 1957.

(e) Pursuant to U.S.S.G. § 3B1.1(a) increase the offense level by 4 levels because the Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. The Defendant does not agree to this enhancement.

(f) Pursuant to U.S.S.G. § 3E1.1 and unless the Defendant commits another crime, obstructs justice, or violates a court order, decrease the offense level by 2 levels for the Defendant's acceptance of responsibility. If the offense level determined prior to this 2-level decrease is level 16 or greater, the United States will move at sentencing to decrease the offense level by 1 additional level based on the Defendant's timely notice of intent to plead guilty.

(g) Pursuant to U.S.S.G. § 5E1.1, restitution will be assessed in an amount to be determined at sentencing or a restitution hearing.

6. No agreement exists about the Defendant's criminal history category pursuant to U.S.S.G. Chapter 4.

7. The Defendant will not file a motion for a decrease in the offense level based on a mitigating role pursuant to U.S.S.G. § 3B1.2 or a departure motion pursuant to U.S.S.G. Chapter 5, Parts H or K.

8. The Defendant waives the right to appeal the guilty plea, conviction, and sentence. Except for claims of ineffective assistance of counsel, the Defendant also waives the right to attack collaterally the guilty plea, conviction, and sentence.

9. The United States will recommend releasing the Defendant on the current conditions for future court appearances if the Defendant does not violate the terms of the order setting conditions of release.

10. Defendant agrees to forfeit to the United States all interest in the property listed in the forfeiture allegation of the Indictment. Defendant agrees that this property is subject to forfeiture because the United States can prove, by a preponderance of the evidence, a nexus exists between the property and the offense, as set out in the forfeiture allegation of the Indictment. The manner of forfeiture of the specifically identified property in the indictment shall occur as follows and must be completed before sentencing:

   a. Community Trust Bank Account xxxx9442: Defendant agrees this property is forfeitable to the United States as proceeds of the criminal conduct and agrees to forfeit his interest in the funds in this account to the United States.

   b. 244.251 acres located at 1131 College Road, Paris, Kentucky, parcel number 060-00-00-025.00: Defendant agrees this property is forfeitable as facilitating property and will forfeit his interest in this real property subject to any encumbrances and timely-filed third party claims.

    c. 131.91 acres located at Jackstown Road, Bourbon County, Paris, Kentucky, parcel number 065-00-00-012.00: Defendant agrees this property is forfeitable as facilitating property and will forfeit his interest in this real property subject to any encumbrances and timely-filed third party claims.

  11. The Defendant agrees to a voluntary, five-year exclusion from participating in or receiving benefits from any federal procurement or non-procurement transaction in accordance with 2 C.F.R. § 180.1020(a) and 7 U.S.C. § 2209j(a). This means that the Defendant will be excluded from participating in most procurement and non-procurement programs and activities unless such program is exempted under 2 C.F.R. § 180.215 and 2 C.F.R. § 417.215. The exclusion includes the USDA programs administered by the Risk Management Agency and the Farm Service Agency. The Defendant further agrees to be excluded from indirectly or directly holding any USDA certifications to produce or handle organic agricultural products through the USDA Agricultural Marketing Service National Organic Program (NOP). The Defendant further agrees to be excluded from participating in, receiving, or earning any income or any other benefit from the Federal Crop Insurance Program and the Farm Service Agency. As part of this agreement, Defendant agrees to waive any judicial or administrative right that he may have to challenge this voluntary exclusion. The Defendant further agrees that his voluntary, five-year exclusion shall still be valid even should there not be an available administrative mechanism to effectuate or enforce such exclusions. The Defendant's voluntary, five-year exclusion shall be effective upon the date this plea agreement is fully executed.

12. The Defendant agrees to cooperate fully with the United States Attorney's Office by making a full and complete financial disclosure. Within 30 days of pleading guilty, the Defendant agrees to complete and sign a financial disclosure statement or affidavit disclosing all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party, and disclosing any transfer of assets that has taken place within three years preceding the entry of this plea agreement. The Defendant will submit to an examination, which may be taken under oath and may include a polygraph examination. The Defendant will not encumber, transfer, or dispose of any monies, property, or assets under the Defendant's custody or control without written approval from the United States Attorney's Office. If the Defendant is ever incarcerated in connection with this case, the Defendant will participate in the Bureau of Prisons Inmate Financial Responsibility Program, regardless of whether the Court specifically directs participation or imposes a schedule of payments. If the Defendant fails to comply with any of the provisions of this paragraph, the United States, in its discretion, may refrain from moving the Court pursuant to U.S.S.G. § 3E1.1(b) to reduce the offense level by one additional level, and may argue that the Defendant should not receive a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a).

13. The Defendant understands and agrees that, pursuant to 18 U.S.C. § 3613, whatever monetary penalties are imposed by the Court will be due and payable immediately and subject to immediate enforcement by the United States. If the Court

imposes a schedule of payments, the Defendant agrees that it is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment. The Defendant waives any requirement for demand of payment on any fine, restitution, or assessment imposed by the Court and agrees that any unpaid obligations will be submitted to the United States Treasury for offset. The Defendant authorizes the United States to obtain the Defendant's credit reports at any time. The Defendant authorizes the U.S. District Court to release funds posted as security for the Defendant's appearance bond in this case, if any, to be applied to satisfy the Defendant's financial obligations contained in the judgment of the Court.

14. If the Defendant violates any part of this Agreement, the United States may void this Agreement and seek an indictment for any violations of federal laws, and the Defendant waives any right to challenge the initiation of additional federal charges.

15. This document and the supplement contain the complete and only Plea Agreement between the United States Attorney for the Eastern District of Kentucky and the Defendant. The United States has not made any other promises to the Defendant.

16. This Agreement does not bind the United States Attorney's Offices in other districts, or any other federal, state, or local prosecuting authorities.

17. The Defendant and the Defendant's attorney acknowledge that the Defendant understands this Agreement, that the Defendant's attorney has fully explained this Agreement to the Defendant, and that the Defendant's entry into this Agreement is voluntary.

ROBERT M. DUNCAN, JR.
UNITED STATES ATTORNEY

Date: 10/23/18     By: _____
                       Kathryn M. Anderson
                       Assistant United States Attorney

Date: 10/23/18         _____
                       Ronnie Jolly
                       Defendant

Date: 10/23/18         _____
                       Grant Ballard
                       Attorney for Defendant

12